# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

CLYDE W. CLARK,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-4122-PAZ

**MEMORANDUM OPINION AND
ORDER**

---

## I. INTRODUCTION

The plaintiff Clyde W. Clark ("Clark") seeks judicial review of a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI Supplemental Security Income ("SSI") benefits. Clark claims the ALJ misinterpreted the medical evidence, and erred in failing to consider the impact of Clark's obesity on his residual functional capacity, finding Clark's mental impairment is not disabling, failing to give proper weight to the opinions of acceptable medical sources, evaluating his credibility, and, ultimately, concluding he is not disabled. (*See* Doc. No. 11)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On February 24, 2003, Clark protectively filed an application for SSI benefits and an application for DI benefits, alleging a disability onset date of February 22, 2002. (R. 50-52, 288-90; *see* R. 13) Clark claims he is disabled due to "a sleep problem and back problems, weight problem, diabetes, acid reflux, high blood pressure, [and] sleep apnea." (R. 66) He claims these conditions prevent him from working because he is sick

to his stomach all of the time, and he is unable to stand or walk for any length of time without having a lot of pain. He alleges he stopped working because of abdominal and back pain. According to Clark, he requested a different position and his employer would not accommodate him, eventually firing him. (*Id.*) Clark's applications were denied initially and on reconsideration. (R. 26-33, 40-42, 291-302)

Clark requested a hearing (R. 43, 45), and a hearing was held before ALJ George Gaffaney on January 4, 2005. (R. 305-36) Clark was represented at the hearing by attorney Jay Denne. Clark testified at the hearing, and Vocational Expert ("VE") G. Brian Paprocki also testified.

On May 27, 2005, the ALJ ruled Clark was not entitled to benefits. (R. 10-19) Clark appealed the ALJ's ruling, and on September 9, 2005, the Appeals Council denied Clark's request for review (R. 6-9), making the ALJ's decision the final decision of the Commissioner.

Clark filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. Clark filed a brief supporting his claim on January 13, 2006. On January 19, 2006, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The Commissioner filed a responsive brief on March 13, 2006. The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Clark's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Clark's hearing testimony

Clark was born in 1956, making him forty-eight years old at the time of the ALJ hearing. He dropped out of school after the eighth grade. The last date he worked was February 22, 2002, when he was working on a production line at Tur-Pak Foods, where he had been employed for about a year. The job was very fast-paced and required almost

constant standing and constant movement, bending up and down and reaching back and forth. Clark does not believe he could return to the job because of pain throughout his arms, hands, back, and legs, which prevents him from standing or walking for long. He indicated the job ended after an argument with his supervisor. According to Clark, he was having a lot of pain, and digestive difficulties necessitated frequent trips to the restroom. He asked his supervisor to change him to a different position, and when his supervisor failed to do so, Clark "had words with him and told him [he] was going to kick his butt," resulting in Clark's termination from the job.

Clark stated his primary medical problems are "a lot of pain in [his] body, lower back, and legs, [and] a lot of depression and stress." He described the pain as a throbbing, sharp pain in his legs and lower back that prevents him from moving. He stated his back problem started while he was working at Tur-Pak.

Clark underwent a work evaluation at Goodwill Industries. They started him out doing janitorial work, which included cleaning, mopping, and sweeping. After he had worked for about thirty minutes, he would be in pain, breathing hard, and "running low energy." He would have to stop and sit down for about twenty minutes. He stated that when he sits, he cannot sit up straight for a long period of time; he must move around and change positions and his legs hurt all the time. When he is sitting, he often has to lean back and rest his head against something. He sometimes puts his feet up, but he mostly tries to keep his legs in frequent motion. He estimated had can sit for thirty to forty-five minutes at a time without having to substantially alter his position.

Clark stated his pain has reached such a level of severity that he cannot even shower and dress himself without assistance from his girlfriend. He cannot shave all at once, but must stop to sit down and rest during the task. When he gets up in the morning, he checks his blood sugar, takes his medications, and then sits and watches television. He indicated he used to help his girlfriend with the housework, but he no longer is able to do so. He

used to clean the bathroom and sweep, mop, and vacuum the floors. He now cannot do any housework.

Clark stated that in addition to his leg and lower back pain, he has sharp pain up under his rib cage on both sides, and he has problems with bleeding hemorrhoids. Since his job at Tur-Pak ended, his pain has continued to worsen. He indicated his doctor was going to refer him to a surgeon to have "surgery for weight loss," but he failed to appear for an appointment with the surgeon because he did not have transportation. Clark's driver's license has been suspended for nonpayment of child support.

Clark has a history of using illegal drugs. He stated he quit using drugs about four years prior to the ALJ hearing. He indicated drug use was not a factor in his argument with his supervisor that led to his termination from Tur-Pak. He has continued to have an intermittent problem with alcohol abuse, noting he drinks with friends on weekends. He indicated he used to drink a case or more of beer per day, but he "slowed down" a couple of years before the hearing. According to Clark, he no longer drinks at all during the week, and he may have three or four mixed drinks and a couple of beers on the weekend. He smokes about a pack of cigarettes per day.

Clark stated he tries to exercise, but he is unable to do much due to his pain. He walks a bit on the street in front of his house, but he has to walk a few yards, stop to rest, and then walk a few more yards. He is no longer able to go hunting and fishing like he used to, but he has been able to plant a small vegetable garden, which he cares for with his girlfriend's help. He cooks out on the grill in nice weather, and he goes grocery shopping about once a month, again with his girlfriend's help. His girlfriend handles the household finances and pays the bills, and he is unsure whether he could handle benefits on his own. He talks with his mother on the phone once or twice a month, and he spends a lot of his time sitting in his garage, where he listens to music or watches television. Clark stated when his girlfriend is not around, Clark's brother comes over to help take care

of his daughter. Clark stated he had to have help with childcare because he would be "kind of nodding in and out during the day."

Clark takes a number of medication to treat his diabetes, allergies, high blood pressure, cholesterol, depression, digestive problems, and sleep problems. He stated his diabetes is not under good control, and his fluctuating blood sugar makes him dizzy, shaky, and "high sometimes." With regard to his depression, Clark stated he "had a lot of issues from childhood," which, combined with his inability to do anything due to pain, causes him to feel moody and depressed.

Clark's family income currently consists of food stamps and other State aid. Clark stated he is unable to work because of his pain, and because he has a very short temper and problems getting along with people.

## 2.     *Clark's medical history*

Clark is six feet tall. The medical evidence of record indicates that from early 2002 through late 2004, Clark's weight varied from about 290 pounds to 315 pounds or more.

Beginning May 24, 2002, Clark was seen at the Siouxland Community Health Center for various physical problems. His treatment was followed primarily by Physician's Assistant Molly Earleywine. Records indicate Clark underwent repeated laboratory testing, as well as other diagnostic testing in connection with his multiple complaints.

An x-ray of Clark's chest on June 24, 2002, showed his heart and lungs to be normal. Clark underwent a stress echocardiogram on July 17, 2002. He exercised for six minutes and forty-eight seconds, achieved 89% of his predicted heart rate, and had no chest pain either during or after exercise. The cardiologist assessed the study as showing a low probability for ischemia, fair exercise tolerance, and negative indication of chest pain syndrome or arrhythmia.

Clark underwent an EGD study on February 5, 2003, to evaluate his complaint of ulcer disease or reflux. The study showed no active ulcers, some diffuse antral gastritis, and some mild reflux. Clark was advised to elevate the head of his bed, to lose weight, and not to lie down for at least two hours after eating, and he was started on Protonix.

An x-ray of Clark's back was done on February 24, 2003, to evaluate his complaint of back pain. The x-ray of his lumbar spine showed minimal osteophytes, but otherwise the study was negative, showing no acute injury or anomaly.

Clark saw an ear, nose and throat specialist in February 2003, for evaluation of nasal problems and sleep apnea. He was scheduled for surgery in an attempt to remedy his nasal obstruction.

On March 27, 2003, P.A. Earleywine wrote a letter to the state disability examiner in which she described Clark's medical condition as follows:

> He does have multiple chronic medical concerns including morbid obesity with central obesity and associated diabetes mellitus type II, hypertension, dyslipidemia. He also suffers from significant sleep apnea and episodes of hypoxia requiring nightly treatment with a CPAP machine. He also suffers from chronic GERD, gastritis and chronic epigastric pain. Lastly, he has chronic lumbosacral pain which is more than likely musculoskeletal in nature due to his severe obesity and decon-ditioning. It is my opinion that he is not able to be gainfully employed at this time due to the numerous medical conditions as noted above. He has very low exercise tolerance and is chronically short of breath. I do not feel that he is a candidate to be employed in any manual labor job. He also suffers from depression and chronic fatigue, which would also limit his ability to do any type of work at this time.

(R. 205)

Clark continued to see P.A. Earleywine throughout the remainder of 2003, with complaints of chronic low back and leg pain, severe GERD, and chronic depression. He also complained of some visual disturbances, which were thought to be due to his diabetes.

He underwent nasal surgery on May 2, 2003, and healed well.  Clerk did not resume use of the CPAP machine following surgery.  The therapist stated he had "tried every different mouth piece and nose piece there is under the sun, but [Clark] cannot tolerate it . . . [due to] problems with claustrophobia and problems relating from his childhood."  (R. 174)  P.A. Earleywine prescribed Lortab at night to help Clark tolerate the CPAP mask.  She also gave Clark information about gastric bypass surgery, and referred him for an evaluation.  According to P.A. Earleywine's notes dated August 13, 2003, there was a wait of one to one-and-a-half years to get in for the surgery, and Clark would have to stop smoking at least six months prior to the surgery.  Clark was advised to lose weight, exercise, and limit has carbohydrate intake.

On July 31, 2003, Dennis A. Weis, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form regarding Clark.  Dr. Weis noted Clark complained of constant nausea; inability to stand for very long or walk very far without pain; and pain most of the time in his back, neck, legs, and rib cage, aggravated by cold weather and by activity.  Clark also complained of lack of strength in his arms and hands.  Dr. Weis found Clark has "severe medically determinable impairments that do not meet or equal any listings."  He found Clark to be deconditioned, but opined Clark could lift up to twenty pounds occasionally and ten pounds frequently; stand or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and push/pull without limitation.  He opined Clark should never climb ladders, ropes, or scaffolds, but he occasionally could climb ramps or stairs, balance, stoop, kneel, crouch, or crawl.  He noted that other than P.A. Earleywine's statement regarding Clark's condition, no treating or examining source had made any specific recommendations regarding Clark's functional capacity.

On August 20, 2003, Clark saw counselor Sheila Johnson for an intake evaluation and counseling session after he complained of depression to P.A. Earleywine.  Clark

described severe physical abuse that he underwent during his childhood, as well as incidents where he witnessed extreme physical violence between his parents. He complained of daily feelings of depression and hopelessness, fatigue and low energy, and difficulty concentrating. He stated his symptoms made it "very difficult" for him to take care of things at home, to work, or to get along with other people. Ms. Johnson assessed Clark as severely depressed. Clark saw Ms. Johnson for a therapy session on August 27, 2003. At some point, a doctor prescribed Wellbutrin for Clark, but the record is not clear when this occurred. On August 28, 2003, at the recommendation of Ms. Johnson, P.A. Earleywine added Paxil to Clark's medications. Clark returned to see Ms. Johnson on September 10, 2003, but there is no indication he continued to see her after that date.

Beginning November 25, 2003, Clark underwent a work site assessment at Goodwill Industries. Clark requested work in the janitorial area, and he performed janitorial work for three weeks. Clark complained of increasing pain and discomfort, shortness of breath, and chest pain after working only a few hours, three days per week. Evaluators determined Clark could communicate effectively, answer questions, and express himself without any difficulty. He was cooperative and a willing worker, learning new jobs quickly and with little difficulty after some one-on-one instruction and demonstration of the job. He had no difficulty understanding the work or what was expected of him. He made good effort, but experienced significant physical barriers to competing tasks in the janitorial and production areas. He required a number of breaks throughout the day due to fatigue and shortness of breath. Clark missed several days of work due to doctors' appointments and an auto accident. Evaluators noted Clark was only scheduled to work five hours per day, three days per week, but he still missed a total of nine days during his assessment. Clark exhibited some inappropriate behavior in his interactions with Goodwill staff. The evaluators noted Clark's physician had placed the following functional restrictions on him: lift and/or carry up to twenty pounds occasionally and ten pounds

frequently; only occasional climbing; and no bending, stooping, kneeling, crawling, or crouching. The Goodwill evaluators concluded Clark's "capacity to function in a work setting is extremely limited and would indicate that his ability to enter competitive employment at this time may not be possible given the restrictions." (R. 138)

On January 9, 2004, Melodee S. Woodard, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form in connection with reconsideration of Clark's application for disability benefits. Dr. Woodard opined Clark could lift thirty pounds occasionally and ten pounds frequently; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and push/pull without limitation. She opined Clark could perform all postural activities except balancing on an occasional basis, and he would have no other work-related functional limitations. The doctor noted Clark had failed to comply with medical advice that he stop smoking and drinking alcohol, exercise, and lose weight. She noted his ongoing back pain had been attributed to his obesity and deconditioning. Dr. Woodard indicated she had not reviewed a treating or examining source statement regarding Clark's physical capacities except for the opinion letter written by P.A. Earleywine. Dr. Woodard stated the limitations she had suggested for Clark were not inconsistent with P.A. Earleywine's opinion regarding Clark's physical capacity.

On January 23, 2004, Clark underwent a psychodiagnostic mental status exam by Michael P. Baker, Ph.D., at the request of Disability Determination Services. Dr. Baker's impressions of Clark's mental status were that Clark suffers from depressive disorder not otherwise specified, polysubstance dependence in partial remission, and dependent personality traits, and he assessed Clark's current Global Assessment of Functioning at 50, indicating serious symptoms or serious impairment in social, occupational, or school functioning. Dr. Baker opined Clark would have major limitations in his ability to carry out instructions that require attention, concentration, and pace.

On February 12, 2004, Dee E. Wright, Ph.D. reviewed the record and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form concerning Clark. Dr. Wright opined Clark would be moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, respond appropriately to changes in the work setting, and accept instructions and respond appropriately to criticism from supervisors. Dr. Wright otherwise found Clark would have no significant mental limitations in his ability to function in the workplace. Dr. Wright noted Clark had reported no psychological difficulties in connection with caring for his girlfriend's three-year-old child. Dr. Wright opined Clark could sustain short-lived, superficial interaction with others in appropriate ways, and he could sustain sufficient concentration and attention to perform noncomplex, repetitive, and routine cognitive activity without severe functional limitations. Dr. Wright found Clark to have severe medically-determinable mental impairments including a depressive disorder, dependent personality traits, and polysubstance dependence in partial remission, but further found these impairments did not meet or equal Listing severity.

In July 2004, Clark was evaluated by a neurosurgeon in connection with Clark's complaints of continuing low back and left leg pain. Doctors found some diffuse degenerative changes in Clark's lower lumbar spine, but nothing warranting surgical intervention. They referred him to a pain clinic, where Clark received several injections which he complained were not helpful. Ultimately, in December 2004, doctors suggested Clark should pursue weight reduction. They believed he was 100 to 150 pounds overweight for his height, and they opined this extra weight could be contributing to his pain.

The next record evidence of Clark's mental health treatment is a treatment note dated September 2, 2004 – almost a full year after the last record evidence that he saw therapist Ms. Johnson – indicating Clark "returned" to Siouxland Mental Health Center

"for a follow up on his Major Depressive Disorder, Recurrent Moderate, Oppositional Defiant Disorder, and Alcohol Dependence." (R. 286) There is no indication in the record of when Clark began treatment at Siouxland Mental Health Center ("SMHC"). As of this visit, Clark was taking Wellbutrin, Amitriptyline, Neurontin for pain, and Paxil, and Seroquel was added to his medications. Clark complained of difficulty falling asleep and frequent waking during sleep. He continued therapy at SMHC on October 4 and 25, 2004, and November 29, 2004, with increases in his medication dosages at each visit. At one visit, Clark reported that the pain management clinic was "giving up" on him, but he still had ongoing pain.

### 3.    *Vocational expert's testimony*

The ALJ asked VE G. Brian Paprocki to consider an individual forty-eight years of age, with an eighth-grade education and Clark's past relevant work, who has the following limitations:

> [L]imit lifting frequently to 10 pounds, occasionally to 20. Standing to two hours in an eight-hour workday, sitting to six hours in an eight-hour workday; no ladder-climbing. Other nonexertional would be: occasional only, balance, stoop, crouch, kneel, crawl and stair climbing. Environmental limits we would have not constant, but just frequent exposure to heat, cold, humidity, dust, fumes, noise and vibrations. And occasional only exposure to hazards. The other limitations would be only occasional changes in the routine work setting. Only occasional production rate pace defined as strict quotas or timeframes. . . . Frequently to only carrying out detailed instructions, only occasional interaction with the public or coworkers. If we assume the claimant has these restrictions, could any of his past relevant work be done?

(R. 331-32) The VE indicated the hypothetical claimant could not perform any of Clark's past work. The individual would be capable of only sedentary-type work activity, and

Clark's past work required six or more hours of standing and walking. The VE also indicated the individual would not have any transferable skills to some other type of work.

However, the VE opined the individual could perform unskilled, sedentary jobs, such as some type of assembly work, packing work, inspection and checking work, or administrative support work. He gave examples of eyedropper assembler, rotor assembler, dowel inspector, button inspector, or document preparer. The VE stated all of these jobs exist in sufficient numbers in the local and national economies.

The ALJ then asked the VE to consider the same individual as before, but with the following limitations:

> My second hypothetical would be the 10 hours frequent lifting, 20 occasionally, the sitting was limited to 30 minutes at a time, otherwise, still the standard two hours in the sitting, six hours in an eight-hour workday. Still only occasional balancing, but no stooping, crouching, keeling [sic] or crawling, only occasional climbing stairs or ladders. Only occasional exposure to cold or hazards and the frequent only to heat, humidity, dust, fumes, noise and vibration, and just simple, routine, repetitive or constant tasks. Only occasional changes, only occasional independent decisions, we'll add that. No production rate pace, again, only frequently carry out detailed instructions and again only occasional interaction with the public or coworkers. Do these changes, if we assume an individual of the same age, education, work experience as the claimant with these restrictions, are there any jobs such a person could perform?

(R. 334) The VE indicated this hypothetical individual would be unable to perform the assembly, checking and inspection jobs listed previously, leaving only the administrative support occupations such as document preparer. As to the latter, the VE stated the numbers of jobs would be reduced by about half, still leaving sufficient numbers of jobs available in the local and national economies.

The ALJ then asked the VE to consider the same individual as in the second hypothetical, but who would have to take eight unscheduled rest breaks per day for twenty minutes at a time. The VE stated this would eliminate all competitive employment because of the time lost on the job.

## 4. The ALJ's decision

The ALJ found Clark has not engaged in substantial gainful activity since his alleged disability onset date of February 22, 2002. He found Clark has severe impairments consisting of degenerative disc disease and depression, and non-severe impairments of high blood pressure, GERD, sleep apnea, diabetes, and tobacco abuse. He found the latter impairments not to be severe because they are controlled with medication and/or treatment and no more than minimally limit Clark's ability to perform work-related activities. He further found Clark's mental limitations would cause him moderate restriction of the activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. He concluded Clark's impairments, either singly or in combination, do not meet the Listing level of severity.

The ALJ noted Clark has a poor work history and he appears to have little motivation to work. He noted there is no objective medical evidence to substantiate Clark's allegation that severe back pain limits his ability to work, and physical examinations have shown he has full motor strength throughout his extremities and normal sensory examinations. An MRI of his lumbar spine showed some degenerative disc disease but no nerve root impingement or stenosis. He noted that although Clark complains of severe limitations in walking, no doctor has prescribed any type of assistive device for ambulation. He further noted Clark has not followed doctors' advice to lose weight, exercise, or stop smoking and drinking alcohol, and he has failed to follow through with

13

recommended gastric bypass surgery. The ALJ found these factors indicate Clark's back pain is not as debilitating as he alleges. The ALJ also noted medications are helpful in treating Clark's symptoms when he takes them as prescribed.

With regard to Clark's claim of disabling depression, the ALJ noted medications were helpful in alleviating his symptoms, and his depression appeared to be moderate in nature. The ALJ found Clark's limited daily activities were inconsistent with the limitations indicated by the medical evidence of record. Overall, the ALJ concluded Clark's allegations of pain and limitations were not credible.

The ALJ found Clark retains the residual functional capacity to work with the following restrictions: lift/carry up to twenty pounds occasionally and ten pounds frequently; stand for two hours out of eight and sit for six hours out of eight; never climb ladders, but occasionally balance, stoop, crouch, kneel, crawl, climb stairs, and be exposed to hazards; and frequently be exposed to heat, cold, humidity, dust, fumes, noise, and vibrations. Regarding Clark's mental limitations, the ALJ found Clark can carry out detailed instructions frequently, and occasionally can make changes in a routine work setting, have a production rate pace (i.e., strict quotas or timeframes), and interact with the public and coworkers.

Relying on the VE's testimony, the ALJ concluded Clark cannot return to any of his past relevant work, but he can perform unskilled, sedentary work, such as assembler and packager, inspector, and administrative support work, each of which exists in significant numbers in the regional and national economies. The ALJ therefore concluded Clark is not disabled.

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain

non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91,

99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)     the claimant's daily activities;
> 2)     the duration, frequency and intensity of the pain;
> 3)     precipitating and aggravating factors;
> 4)     dosage, effectiveness and side effects of medication;
> 5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Clark asserts the ALJ erred in numerous respects. He first argues the ALJ erred in finding the record does not show "any evidence" of nerve root compression. Based on his counsel's own Internet research, Clark contends the fact that he has radicular pain in his left lower leg is evidence that he has nerve root compression. The court does not agree. As the Commissioner notes in her brief, although nerve root compression may cause radicular leg pain, it does not follow that all radicular leg pain is always the result

of nerve root compression. Clark argues his doctors' failure to use the specific term "nerve root compression" does not mean there is no evidence of its existence. However, the ALJ was not free to interpret the medical records by substituting his own judgment for the recorded impressions of Clark's treating physicians. *See Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990) (citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989)). The ALJ properly relied on the medical evidence of record in determining there is no objective evidence that Clark suffers from nerve root compression, and in finding his back impairment does not meet the Listing level of severity.

Clark next argues the ALJ erred in failing to take into account the effects of his obesity on the severity of his condition and, presumably, his residual functional capacity. The Commissioner failed to address this argument at all in her brief. The court notes Clark has claimed obesity as an impairment since he filed his original applications for benefits. The ALJ made no finding regarding the severity of Clark's obesity, finding he has severe impairments of degenerative disc disease and depression, and non-severe impairments of high blood pressure, GERD, sleep apnea, diabetes, and tobacco abuse. Clark's doctors repeatedly referred to his obesity as a possible cause for his back and leg pain and some of his other ailments. The court finds the record contains substantial evidence that Clark's obesity is a severe impairment, and the ALJ therefore should have considered Clark's obesity in assessing his residual functional capacity. As the Social Security Administration has recognized, "The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." SSR 02-1p, Question 8. Although obesity is not, itself, a listed impairment, the SSA has "instruct[ed] adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim

at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." SSR 02-1p, Intro.

The ALJ's failure to consider Clark's obesity in determining his residual functional capacity resulted in an error at step four of the sequential evaluation process. The court therefore must determine whether the ALJ's error requires remand for further proceedings. In considering whether further proceedings are required, the court turns to consideration of Clark's next objection to the ALJ's decision. Clark argues the ALJ erred in giving "no weight to the opinions regarding employment and disability" rendered by P.A. Earleywine and the Goodwill evaluator. The ALJ gave these opinions no weight because he found them to be conclusory and not supported by other substantial medical evidence of record, and because he found these two evaluators were not acceptable medical sources under the Regulations. *See* R. 15. The ALJ further noted these evaluators had rendered opinions on the ultimate issue of disability, which is reserved to the Commissioner under the Regulations. *Id.* (citing 20 C.F.R. §§ 404.1527(e), 416.927(e)).

The regulations provide that evidence to establish an impairment must come from an "acceptable medical source." Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). The ALJ correctly determined that the evidence indicates Clark has medically-determinable impairments, based on treatment notes from acceptable medical sources. The regulations further provide that once an impairment has been determined, the Commissioner may consider evidence "from other sources" to show the severity of the impairments and how they affect a claimant's ability to work. These "other sources" expressly include physicians' assistants and "private social welfare agency personnel." 20 C.F.R. §§ 404.1513(d)(1) & (3), 416.913(d)(1) & (3). The court finds that although it was proper for the ALJ to reject the opinions of P.A. Earleywine and the Goodwill evaluator for purposes of determining

whether Clark has a medically-determinable impairment, once having made the determination that such impairments exist, the ALJ improperly gave these two opinions no weight in determining the severity of Clark's impairments.

The record indicates P.A. Earleywine acted as Clark's treating medical provider for an extended period of time. She had a regular opportunity to observe Clark and to assess the credibility of his subjective complaints. Nowhere in the record does P.A. Earleywine ever indicate Clark was malingering, drug-seeking, or otherwise improperly reporting the nature and severity of his complaints. Similarly, the Goodwill evaluator noted Clark put forth a good effort and he was a cooperative and willing worker. The evaluator's observations of Clark over a period of three weeks were that he has an extremely limited ability to function in the workplace. The court finds the observations of P.A. Earleywine and the Goodwill evaluator to be significant in assessing the severity of Clark's impairments. These observations lend credence to Clark's subjective complaints regarding the extent of his functional limitations. The Commissioner argues an ALJ has discretion in weighing "other medical evidence" and may chose to give opinions such as these "little weight." (Doc. No. 13, p. 11) Here, however, the ALJ gave the opinions *no weight*. The court finds the ALJ erred in failing to give these two opinions some weight in making a final determination regarding Clark's disability.

Considering the record as a whole, including both the evidence that supports the ALJ's conclusions and the evidence that detracts from them, the court finds the record does not contain substantial evidence to support the ALJ's conclusion that Clark retains the residual functional capacity to work. However, neither does the record conclusively establish that Clark is disabled. The court finds further proceedings are necessary to allow the Commissioner to consider Clark's obesity in evaluating the severity of his condition, to give proper weight to the other medical evidence, and to further develop the

record as necessary to reach a conclusion regarding Clark's ability to function in the workplace.

## V. CONCLUSION

The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). In this case, the court finds further proceedings are necessary for a proper determination regarding the claimant's disability.

Accordingly, the Commissioner's decision is **reversed** and this case is **remanded for further proceedings** pursuant to sentence four of 42 U.S.C. § 405(g). Upon remand, the Commissioner is directed to consider the effects of Clark's obesity on his residual functional capacity, and to afford proper weight to the opinions of P.A. Earleywine and the Goodwill evaluator.

**IT IS SO ORDERED.**

**DATED** this 9th day of May, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT